**APPLICATIONS RESEARCH CORPORATION**

v.

**NAVAL AIR DEVELOPMENT CENTER, Frank J. Drummond, H. Lawrence Garrett, III, and SelectTech Services Corporation.**

Civ. A. No. 89–9007.

United States District Court, E.D. Pennsylvania.

Oct. 24, 1990.

As Amended Dec. 4, 1990.

John C. Fenningham, Corr, Stevens & Fenningham, Trevose, Pa., for plaintiff.

Joel R. Feidelman, Alan R. Grayson, Washington, D.C., Gregory T. Magarity, Philadelphia, Pa., for SelectTech.

James G. Sheehan, U.S. Atty., John N. Joseph, Asst. U.S. Atty., for the Federal Defendants.

## MEMORANDUM OF DECISION

McGLYNN, District Judge.

Plaintiff Applications Research Corporation (ARC), the then incumbent contractor for computer management and support services at the Naval Air Development Center (NADC or Center), was unsuccessful in its bid to remain as contractor when a 1989 procurement was awarded to SelectTech Services Corporation (SelectTech). Distressed by this turn of events, ARC brought this action charging the Secretary of the Navy—acting through NADC and Contracting Officer Frank J. Drummond [1]—with an abuse of discretion and a violation of federal procurement laws.

Specifically, in Counts I and II of its amended complaint, ARC seeks judicial review under Section 702 of the Administrative Procedure Act (APA), 5 U.S.C. § 702. ARC avers: (1) that the Federal Defendants abused their discretion by irrationally concluding that SelectTech's bid was responsive to a key personnel clause in the procurement solicitation, notwithstanding the known intention of SelectTech to staff the contract with personnel different from those listed in the company's technical proposal; (2) that by allowing SelectTech to misrepresent its intention to staff the contract with the key personnel listed in its proposal, the Federal Defendants illegally ignored the terms of the key personnel and evaluation criteria clauses in the solicitation and arbitrarily evaluated ARC and SelectTech's proposals as technically equal; (3) that the Federal Defendants abused their discretion by finding SelectTech to be a responsible bidder despite that company's misrepresentation of its women-owned business status; (4) that the Federal Defendants showed favoritism toward SelectTech and abused their discretion by permitting amendments to the solicitation that accommodated only SelectTech; (5) that the Federal Defendants arbitrarily denied ARC the opportunity to supplement its award protest and to inspect NADC's files; and (6) that the Federal Defendants have acted illegally and have abused their discretion by allowing SelectTech to perform the contract with fewer personnel than were required in the solicitation, thus materially modifying the contract.

Accordingly, ARC asks the court to provide the following relief: to declare ARC to be the successful bidder on the NADC con-

---

1. NADC, Mr. Drummond, and Secretary of the Navy H. Lawrence Garrett, III are hereinafter referred to collectively as the "Federal Defendants."

tract; to enjoin the Federal Defendants to set aside the award to SelectTech and to prevent SelectTech's further performance; and to enjoin the Federal Defendants to award the contract to ARC.

Additionally, in Count III of its amended complaint, ARC seeks to set aside the award of the contract to SelectTech and to collect damages from SelectTech resulting from that company's alleged staffing and women-owned status misrepresentations in its contract proposal to NADC.

SelectTech filed a motion to dismiss ARC's amended complaint. The administrative record was filed and the Federal Defendants moved for summary judgment against ARC. Thereafter, ARC moved for summary judgment against all defendants. SelectTech responded to ARC's motion by filing a cross-motion for summary judgment and by renewing its motion to dismiss.[2] These motions are now before the court. For the reasons stated below, ARC's motion will be denied and the defendants' motions will be granted.

## I. JURISDICTION AND STANDARD OF REVIEW

### A. *Subject Matter Jurisdiction and Standing*

■ At the outset, it is noted that because ARC does not seek specific performance of its previous contract with NADC but, rather, seeks to have the recent award to SelectTech set aside and made to itself, this action is not within the United States Claims Court's exclusive jurisdiction.[3] ARC's amended complaint predicates this court's subject matter jurisdiction to decide Counts I and II on several regulations and statutes, including Section 10 of the APA, 5 U.S.C. § 702 (1977). Sec-

tion 702 does not, however, provide an independent grant of subject matter jurisdiction to review agency action. *Califano v. Sanders*, 430 U.S. 99, 105, 107, 97 S.Ct. 980, 984, 985, 51 L.Ed.2d 192, 199, 200–01 (1977). Nevertheless, the court does have jurisdiction under 28 U.S.C. § 1331 (West Supp.1990): Counts I and II "arise under" not only the Federal Acquisition Regulations (FARs) codified in 48 C.F.R., chapter 1, but also the federal common law of government procurement.

■ As a result of ARC and SelectTech's diversity of citizenship, the court also has jurisdiction over Count III. 28 U.S.C. § 1332 (West Supp.1990).

Additionally, as an unsuccessful bidder on a government contract, ARC has constitutional and prudential standing on its own behalf and on behalf of the public to seek judicial review of the award. *Coco Bros., Inc. v. Pierce*, 741 F.2d 675, 678 n. 2 (3d Cir.1984); *Merriam v. Kunzig*, 476 F.2d 1233, 1240 (3d Cir.1973); *National Gateway Telecom, Inc. v. Aldridge*, 701 F.Supp. 1104, 1116 (D.N.J.1988).

### B. *Standard of Review*

A resolution of the pending motions requires an examination of the interplay between the APA and Rule 56 of the Federal Rules of Civil Procedure—a process that has received scant judicial attention.

### 1.) *Summary Judgment*

Under Rule 56(c), a party is entitled to summary judgment in his favor "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact

---

**2.** Because SelectTech's motion to dismiss presents matters outside of the amended complaint, it shall be treated as a motion for summary judgment and consolidated with SelectTech's summary judgment motion. Fed.R. Civ.P. 12(b).

**3.** *See, e.g., Choctaw Mfg. Co. v. United States,* 761 F.2d 609, 619, 621 n. 19 (11th Cir.1985) (disappointed bidder does not seek specific performance and does not implicate the Tucker Act's limitation of relief to money judgments

and the Claims Court's exclusive jurisdiction where bidder seeks termination of another party's contract and award of that contract to itself); *B.K. Instrument, Inc. v. United States,* 715 F.2d 713, 727 (2d Cir.1983) (same); *Mark Dunning Indus. v. Cheney,* 726 F.Supp. 810, 813 (M.D.Ala.1989) (same); *see also Sea–Land Serv., Inc. v. Brown,* 600 F.2d 429, 432–33 (3d Cir. 1979) (Tucker Act precluded district court from granting specific performance of disappointed bidder's *canceled contract* ).

and that the moving party is entitled to a judgment as a matter of law." Fed.R. Civ.P. 56(c). Rule 56(e) further provides:

When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed.R.Civ.P. 56(e).

■ Asserted disputes of fact are "material" if their resolution could affect the outcome of the case under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202, 211 (1986); *Hozier v. Midwest Fasteners, Inc.*, 908 F.2d 1155, 1158 (3d Cir.1990). Matters of proof and evidentiary requirements are not germane to a materiality determination. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510, 91 L.Ed.2d at 211.

■ Inquiry into the genuineness of a factual dispute does, however, introduce procedural and substantive evidentiary burdens into a summary judgment action. Mirroring the directed verdict standard of Federal Rule of Civil Procedure 50(a) in all but procedural posture, the "genuine issue" standard focuses on the sufficiency of evidence and is satisfied if the evidence bearing on the disputed fact is such "that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248, 106 S.Ct. at 2510, 91 L.Ed.2d at 211–12; *Hozier*, 908 F.2d at 1158; *Turner v. Schering–Plough Corp.*, 901 F.2d 335, 340–41 (3d Cir.1990). The evidence must be more than "merely colorable"; it must be "significantly probative." *Anderson*, 477 U.S. at 249, 106 S.Ct. at 2510, 91 L.Ed.2d at 212; *United Transp. v. Conemaugh & Black Lick R.R. Co.*, 894 F.2d 623, 628 (3d Cir.1990). Furthermore, the genuineness inquiry "necessarily implicates the substantive evidentiary standard of proof that would ap-

ply at the trial on the merits." *Anderson*, 477 U.S. at 252, 254, 106 S.Ct. at 2512, 91 L.Ed.2d at 214 (applying clear and convincing standard in libel action). Credibility determinations, the weighing of the evidence, and the drawing of inferences from the underlying facts are, however, jury functions that a judge is not to perform when ruling on a summary judgment motion. *Anderson*, 477 U.S. at 255, 106 S.Ct. at 2513, 91 L.Ed.2d at 216; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538, 553 (1986); *Kronmuller v. West End Fire Co. No. 3*, 123 F.R.D. 170, 173 (E.D.Pa.1988).

■ The oft-cited trilogy of 1986 Supreme Court cases, *Anderson*, *Matsushita*, and *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), refocused the burden of both the moving and the nonmoving parties in summary judgment actions. Regardless of which party would have the burden of persuasion at trial, the initial burden is on the moving party to "show" that there is an *absence of evidence* to support the nonmoving party's case. *Celotex*, 477 U.S. at 325, 106 S.Ct. at 2554, 91 L.Ed.2d at 275; *First Nat'l Bank of Pa. v. Lincoln Nat'l Life Ins. Co.*, 824 F.2d 277, 280 (3d Cir.1987). The moving party need not, however, produce evidence showing the *absence of a genuine issue* of material fact: that is, he need not "negate" the nonmoving party's claim. *Celotex*, 477 U.S. at 323, 325, 106 S.Ct. at 2553–54, 91 L.Ed.2d at 274–75.

■ Once the moving party carries his burden, Rule 56(e) requires the nonmoving party to "designate" specific facts showing that there is a genuine issue for trial as to each element essential to the nonmoving party's case and on which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322, 324, 106 S.Ct. at 2552–53, 91 L.Ed.2d at 273–74; *J.F. Feeser, Inc. v. Serv–A–Portion, Inc.*, 909 F.2d 1524, 1531 (3d Cir.1990). The nonmovant must "do more than simply show that there is some metaphysical doubt" as to such material facts. *Matsushita*, 475 U.S. at 586, 106 S.Ct. at 1356, 89 L.Ed.2d at 552. Although

the nonmoving party need not produce evidence in a form that would be admissible at trial in order to avoid summary judgment, *Celotex*, 477 U.S. at 324, 106 S.Ct. at 3553, 91 L.Ed.2d at 274–75, affidavit testimony must set forth only facts that "would be admissible in evidence." Fed.R.Civ.P. 56(e); *see also* Brunet, *Experts in Summary Judgment Motions*, 16 Litigation No. 3 (1990) at 38 ("many cases ... rely on the Federal Rules of Evidence in considering expert affidavits"). Moreover, to be sufficiently specific, facts set forth in affidavits must not be "presumed"; rather, the affiant must state affirmatively that the facts are true. *Lujan v. National Wildlife Fed'n*, 497 U.S. ——, ——, 110 S.Ct. 3177, 3186–87, 3188–89, 111 L.Ed.2d 695, 714, 716–17 (1990) (also stating that the Rule 56 burdens laid out in the Court's trilogy "are fully applicable when a defendant moves for summary judgment[ ] in a suit brought under Section 702," with the burden on the party seeking review under Section 702 to set forth specific facts showing that he has been adversely affected or aggrieved by agency action within the meaning of a relevant statute).

On cross-motions for summary judgment, the same burdens apply. *Peters Twp. School Dist. v. Hartford Accident and Indem. Co.*, 833 F.2d 32, 34 (3d Cir. 1987); *see also Krupa v. New Castle County*, 732 F.Supp. 497, 505–06 (D.Del. 1990) ("[t]he filing of cross-motions for summary judgment does not require the Court to grant summary judgment for either party"); 10A C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 2720 (1983) at 16–24 (movant concedes the absence of a factual issue and the truth of nonmovant's allegations only for purposes of his own motion and his own legal theories).

### 2.) The APA

■ As noted above, summary judgment is appropriate only when the moving party is "entitled to a judgment *as a matter of law*." Because ARC contends in Counts I and II that it is "a person suffering legal

wrong [as a result of] agency action" and that judicial review is, therefore, appropriate under Section 702 of the APA, Section 702 and the evidentiary standards of the APA are part of the law that circumscribes the court's summary judgment determination.[4] In particular, Section 706 of the APA, with its narrow scope of review of informal agency actions, limits the evidentiary materials to which a party may point under Rule 56 in order to establish the existence or absence of a genuine factual dispute.

Section 706 provides, in part:

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) *hold unlawful and set aside agency action*, findings, and conclusions *found to be—*

(A) *arbitrary, capricious*, an *abuse of discretion*, or otherwise *not in accordance with law;*

. . . .

In making the foregoing determinations, the court *shall review the whole record* or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

5 U.S.C. § 706 (1977) (emphasis added).

NADC's decision to award SelectTech the disputed services contract involved neither adjudication nor rulemaking. That decision unquestionably was "informal agency action." *See Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); *Armstead v. United States Dep't of HUD*, 815 F.2d 278, 280–81 (3d Cir.1987) ("some informal action is neither adjudication or [sic] rulemaking"); *Doe v. Devine*, 703 F.2d 1319, 1325 (D.C.Cir.1983) (negotiation of a contract is the "most informal of informal agency action").

---

**4.** Such a limitation does not apply to the court's summary judgment determination on Count III.

 In an informal agency review action, the appropriate standard for review is whether the agency's action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," as specified in Section 706(2)(A). *Camp v. Pitts,* 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106, 111 (1973) (per curiam); *Overton Park,* 401 U.S. at 416, 91 S.Ct. at 823–24, 28 L.Ed.2d at 153; *Occidental Petroleum Corp. v. SEC,* 873 F.2d 325, 337 (D.C.Cir.1989); *Armstead,* 815 F.2d at 281. That standard is narrow and highly deferential: The reviewing court is not to substitute its judgment for that of the agency but is only to make a searching inquiry into the facts to determine whether the agency's decision was legally permissible, reasoned, and factually supported. *See, e.g., Overton Park,* 401 U.S. at 416, 91 S.Ct. at 824, 28 L.Ed.2d at 153; *Bowman Transp., Inc. v. Arkansas–Best Freight Sys.,* 419 U.S. 281, 285–86, 95 S.Ct. 438, 442, 42 L.Ed.2d 447, 456 (1974) (reviewing court will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned"); *Center for Auto Safety v. Dole,* 828 F.2d 799, 809–10 (D.C.Cir.1987); *National Law Center on Homelessness and Poverty v. Dep't of Veterans Affairs,* 736 F.Supp. 1148, 1154 (D.D.C.1990) (arbitrary and capricious standard presumes validity of agency action); *see also United Telegraph Workers v. Western Union Corp.,* 771 F.2d 699, 703 (3d Cir.1985) (an "abuse of discretion" is a clear error of judgment, not simply a different result that can arguably be obtained when applying the law to the facts).

 The facts into which the reviewing court is to make its careful, searching inquiry are limited to those contained in the "whole record"—the administrative record—that was compiled in the course of the informal agency action. *See, e.g., Florida Power & Light Co. v. Lorion,* 470 U.S. 729, 744, 105 S.Ct. 1598, 1607, 84 L.Ed.2d 643, 656 (1985) (Section 706 specifically contemplates judicial review on the basis of agency record compiled in course of informal agency action in which a hearing has not occurred); *Overton Park,* 401 U.S. at 420, 91 S.Ct. at 825, 28 L.Ed.2d at 155 (review is to be based on full administrative record that was before agency at time decision was made). In rare cases where affidavit testimony of agency officials is not merely a post-hoc rationalization for an agency's decision but is evidence that helps to explain how the decision was reached, such testimony may be permitted to supplement the administrative record. *See Overton Park,* 401 U.S. at 419–20, 91 S.Ct. at 825, 28 L.Ed.2d at 155 (it may be necessary for district court to require some explanation of the factors that the agency considered in making its decision); *Camp v. Pitts,* 411 U.S. at 143, 93 S.Ct. at 1244, 36 L.Ed.2d at 111 (where judicial review is frustrated by inadequate agency explanation of its decision, the remedy is to obtain, through affidavits and testimony, additional explanation); *Armstead,* 815 F.2d at 281 (affidavits explaining information that was available to decision-makers at time decision was made were allowed to supplement administrative record). Additionally, in instances in which an administrative record appears adequately to explain an agency decision, but in which a plaintiff specifically alleges bad faith on the part of agency officials and provides a reasonable factual basis for such an allegation, discovery of more than the administrative record is permissible and appropriate if limited to the bad-faith allegation. *Overton Park,* 401 U.S. at 420, 91 S.Ct. at 825–26, 28 L.Ed.2d at 156; *Apex Constr. Co. v. United States,* 719 F.Supp. 1144, 1147 (D.Mass.1989).

Without specifically addressing the APA, the Court of Appeals for the Third Circuit has stated that a court's standard of review is especially strict when the plaintiff is an aggrieved bidder on a government contract who seeks equitable relief. Recognizing that "[j]udicial intrusion into government purchases necessarily delays completion of [procurement] contract[s] and increases costs, with little measurable benefit to the public," *Allis–Chalmers Corp. v. Friedkin,* 635 F.2d 248, 253 (3d Cir.1980), the court has cautioned (mostly in the context of preliminary injunctive relief) that a district court should not substitute its judgment for that of a contracting agency.

Rather, the district court should determine whether *any rational basis* existed for the agency's procurement decision; if a rational basis did exist, the agency's decision must be upheld. *See Sea–Land Serv., Inc. v. Brown*, 600 F.2d 429, 430, 432–34 (3d Cir.1979) (also stating that what is required is a "showing of clear illegality"); *see also Coco Bros., Inc. v. Pierce*, 741 F.2d 675, 679–80 (3d Cir.1984); *Princeton Combustion Research Laboratories v. McCarthy*, 674 F.2d 1016, 1021–22 (3d Cir.1982); *Allis–Chalmers*, 635 F.2d at 253; *M. Steinthal & Co. v. Seamans*, 455 F.2d 1289, 1291–92, 1299, 1301 (D.C.Cir.1971) (in action that was brought under the APA and that *Sea–Land* relied upon, aggrieved bidder alleged that procurement officials acted arbitrarily and capriciously, and court first articulated the "no rational basis" standard of review).

 Once a district court determines that an agency's procurement decision is rational, the court's inquiry is at an end: the court must deny the aggrieved bidder's motion for equitable relief. *Princeton Combustion*, 674 F.2d at 1022; *Sea–Land*, 600 F.2d at 434. Even if the court finds that the agency's decision was irrational, however, the court still has discretion to decide whether to grant or deny equitable relief. In exercising that discretion, the court is to be guided by a balancing of three factors:

> the practical considerations of efficient procurement of [services] for continuing government operations; the public interest in avoiding excessive costs; and the bidder's entitlement to fair treatment through adherence to statutes and regulations.

*Princeton Combustion*, 674 F.2d at 1022 (quoting *Sea–Land*, 600 F.2d at 434). That strict standard of review constrains the court's summary judgment analysis on Counts I and II.

C. *Weight to Be Accorded Comptroller General Decisions*

 The decisions of the Comptroller General are a part of the common law of government procurement to which courts reviewing agency procurement ac-

tions "for any rational basis" often look for guidance. *See M. Steinthal*, 455 F.2d at 1301. Although this court has no obligation to defer to such decisions, the Comptroller General has extensive experience in interpreting government procurement regulations and practices, and therefore the court will consider well-reasoned Comptroller General decisions. *See, e.g., Delta Data Sys. v. Webster*, 744 F.2d 197; 201 (D.C.Cir.1984); *Allis–Chalmers*, 635 F.2d at 255–56 (looking for guidance in Comptroller General decisions); *Sea–Land*, 600 F.2d at 434; *cf. Ameron, Inc. v. United States Army Corps of Eng'rs*, 809 F.2d 979, 986 (3d Cir.1986) (GAO is an arm of the legislative branch, and Comptroller General's recommendations are "a persuasive mechanism through which Congress and disappointed bidders can speak to the executive about the way the laws are being executed"). While a court should be extremely reluctant to overturn agency actions that are in compliance with a reasonably consistent pattern of Comptroller General decisions, a court should not hesitate to do so where it is confronted with procurement illegality that the GAO has failed to recognize or to correct. *Kinnett Dairies, Inc. v. Farrow*, 580 F.2d 1260, 1271 (5th Cir.1978).

Mindful of the foregoing limitations on a reviewing court's authority, I now turn to an analysis of the relevant facts leading to NADC's award to SelectTech.

## II. BACKGROUND

NADC is located in Warminster, Pennsylvania and is the Navy's principal research and development laboratory for all naval aircraft systems other than aircraft-launched weapons systems. Administrative Record (A.R.), Drummond Declaration ¶ 1. Roughly one-half of NADC's approximately 3000 employees are scientists and engineers. With a fully-integrated configuration of eight large-scale mainframe computers and numerous minicomputers and semicomputers, NADC's Central Computer System (CCS) is the Navy's largest hybrid computer complex: it covers over one-half acre. The CCS provides computer

support for each NADC project and program, as well as for more than 100 remote sites that the Department of Defense and its contractors operate. *Id.* at 3. The CCS must be available to its users twenty-four hours a day, seven days a week. *Id.*

SelectTech, an Ohio corporation, has its principal place of business in Dayton, Ohio and provides management, engineering, and technical services to government facilities. A.R. CC, Technical Proposal at 1. Colleen B. Horn, together with her daughters Maxine H. Orum and Linda H. Vikmanis, founded SelectTech in 1981. Orum Affidavit at 1. Of the 160 outstanding shares of the corporation's stock, Horn, Orum, and Vikmanis own 100.[5] *Id.* Moreover, three of SelectTech's four directors are women: Horn, who is Chairman of the Board; Orum, who is Vice–Chairman; and Vikmanis. James A. Riley is the remaining Board member. The Board hires officers, establishes employee compensation, and oversees SelectTech's operations. *Id.* at 2.

Horn, who is 75 years old, is the only woman Board member not involved in the corporation's daily management. Orum is active as SelectTech's Vice–President of Finance, and Vikmanis is both Secretary and Treasurer. The other officers are Dr. Robert B. Finch, Vice–President of Operations, and Riley, who is SelectTech's President. *Id.* at 2–4.

ARC, a Pennsylvania corporation, is a minority-owned small business that has its principal place of business in Warminster, Pennsylvania. Since 1976, ARC has provided NADC with computer management and support services for both the CCS complex and the Center's computerized drafting system, known as the Computer Aided Engineering and Documentation System (CAEDOS). A.R. BB at 122–135; Drummond Declaration ¶ 6. Between 1976 and 1983, NADC awarded ARC a succession of two separate but contemporaneous contracts to perform the discrete CCS and CAEDOS services. Each of those contracts was awarded to ARC on a sole

source basis under the Small Business Administration's 8(a) program for minority contractors, 15 U.S.C. § 637(a). Then, in 1983, NADC awarded a single contract to ARC that, for the first time and for purposes of administrative ease, embraced both the CCS and CAEDOS services. A.R. BB at 122–135; Drummond Declaration ¶ 21. Until ARC graduated from the SBA 8(a) program in May 1985, each NADC contract that ARC received continued to combine the CCS and CAEDOS services. A.R. BB at 122–35; Drummond Declaration ¶ 21. When, in 1986, NADC issued a solicitation for the first *competitive* CCS and CAEDOS contract, the agency decided to continue to procure those services under a single contract—a contract that eventually was awarded to ARC. *Id.*

In October 1988, NADC's Computer Department forwarded to the Center's Contracts Division a completed purchase request form for procurement of the CCS and CAEDOS services that were to expire under ARC's incumbent contract on November 30, 1989. Carl Ruzicka, one of NADC's contract negotiators, assumed the primary responsibility for handling the procurement. Drummond Declaration ¶¶ 5–7. In December 1988, Ruzicka's immediate supervisor, Contracting Officer James Cuorato, executed a Set–Aside Review Form in which he determined to make the procurement a 100% small business set-aside. A.R. C; Drummond Declaration ¶¶ 7, 8. A week later, NADC sent to the Commerce Business Daily, for publication, a synopsis of the computer services being solicited. A.R. D. In a January 1989 letter responding to that synopsis, SelectTech expressed to NADC an interest in competing for the contract. In reply, Ruzicka informed SelectTech that the company would receive a copy of the complete solicitation when issued. A.R. E; Drummond Declaration ¶ 9.

As required by regulation, NADC notified the Department of Labor (DoL) in January 1989 that the Center intended to award a federal services contract. As a

---

**5.** The shareholders of SelectTech are as follows: Horn (40 shares); Orum (40 shares); Vikmanis (20 shares); Robert B. Finch (20 shares); Larry G. Horn (20 shares); and James A. Riley (20 shares).

matter of course, DoL responds to such notices by calculating, based upon job classifications and geographical area, the minimum wages that a contractor must pay his employees. DoL responded to NADC in March 1989 with Wage Determination No. 86–446. A.R. H; Drummond Declaration ¶ 10.

On March 21, Ruzicka presented a Pre-Solicitation Procurement Plan to NADC's Contract Review Board. A.R. I. That Review Board was composed of counsel, a small business specialist, and six senior contracting officers, among whom were Cuorato and defendant Frank J. Drummond, head of NADC's Contracts Division. The Procurement Plan sought to acquire CCS and CAEDOS management and support services through a competitive Request for Proposals (RFP or solicitation) that would provide for a one-year base contract period and four option years. A.R. I; Drummond Declaration ¶ 11; *see* FAR subpart 15.4, 48 C.F.R. § 15.4 (1989). In addition, the Plan contemplated that the acquisition would be through a cost-plus-fixed-fee negotiated contract under which NADC would incur all personnel and other costs and under which the awardee would be paid a fixed fee for providing supervision and management. A.R. I; Drummond Declaration ¶ 11.

Issued on April 6, 1989, RFP N62269–89–R–0338 was tailored to conform to the Procurement Plan. A.R. K. The RFP set forth the terms upon which interested parties were to submit their bids. *Id.* Several clauses of the unamended RFP are germane to the instant action: Clause M17, which stated that a single contract would be awarded for both CCS and CAEDOS services; Clause H53, which described "key personnel requirements"; and Clause M31, which was entitled "Evaluation Factors (Relative Importance) (Cost Type)." *Id.* Clause H53, the key personnel clause, provided:

> (a) Certain skilled experienced professional and/or technical personnel are essential for successful Contractor accomplishment of the work to be performed under this contract. These are *defined as "Key Personnel"* and are those persons whose resumes were submitted for evaluation of the proposal. The Contractor agrees that such personnel *shall not be removed from the contract work or replaced without compliance with paragraphs (b) and (c) hereof.*
>
> (b) If one or more of the key personnel for whatever reason becomes or is expected to become [ ] unavailable for work under this contract for a continuous period exceeding 30 work days or is expected to devote substantially less effort to the work than indicated in the proposal or initially anticipated, the Contractor *shall immediately notify the Contracting Officer and shall, subject to the concurrence of the Contracting Officer or his authorized representative, promptly replace such personnel with personnel of at least substantially equal ability and qualifications.*
>
> (c) All requests for approval of substitutions hereunder must be in writing and provide a detailed explanation of the circumstances necessitating the proposed substitutions. They must contain a complete resume for the proposed substitute and any other information requested by the Contracting Officer or needed by him to approve or disapprove the proposed substitution. The Contracting Officer or his authorized representative will evaluate such requests and promptly notify the Contractor of his approval or disapproval thereof in writing.
>
> (d) If the Contracting Officer determines that suitable and timely replacement of key personnel who have [been] reassigned, terminated or have otherwise become unavailable for the contract work is not reasonably forthcoming or that the resultant reduction of productive effort would be so substantial as to impair the successful completion of the contract or the delivery order, the contract may be terminated by the Contracting Officer....

A.R. K at 20–21 (emphasis added). Clause M31 provided:

(a) The contract resulting from this solicitation will be awarded to that responsible offeror whose offer, conforming to the solicitation, *is determined most advantageous to the Government, cost and other factors considered....*

(b) *The evaluation factors are divided into two categories—technical factors and cost.* The technical evaluation factors listed below are in descending order of importance:

1. Personnel

2. Management Plan

3. Corporate Background

*The evaluation of the offeror's cost plus fixed fee proposal shall be of secondary importance to the evaluation of technical proposals in making award under this solicitation. Although cost is of secondary importance it is an important factor and should not be ignored. The degree of its importance will increase with the degree of equality of the proposals in relation to the other factor(s) on which selection is to be based.*

A.R. K at 51–52 (emphasis added). Significantly, a sixty-five page specification describing the services to be performed under the NADC contract was appended to the RFP and was entitled the Statement of Work (SOW). A.R. K, Section C.

In an April 11 letter to NADC, Select-Tech announced its intention both to submit a proposal in response to the solicitation and to attend the April 20 NADC site visit. A.R. L; Drummond Declaration ¶ 13. The company also sought clarification of Clause H302 of the unamended RFP, which provided:

The cost for relocating contract personnel to other company sponsored effort or for relocating or recruiting replacements for those personnel will not be chargeable under this contract. No reimbursement shall be allowed for relocating cost incurred as a result of:

1. Termination of the assignment thereunder of any employee for unsatisfactory performance or improper conduct or similar cause, or

2. Resignation of any employee.

A.R. K at 24; A.R. L. In particular, Select-Tech questioned whether that clause prohibited charging to the contract only the costs of relocating and recruiting *replacement* personnel, or whether it also prohibited charging the costs of relocating and recruiting *initial staff.* A.R. L.

On April 20, in accordance with RFP Clause L54, representatives of ARC, Select-Tech, and five other interested contractors attended NADC's site visit. A.R. Q; Drummond Declaration ¶ 16. During the visit, attenders asked Mr. Ruzicka why labor categories cited in the RFP differed from labor categories in the DoL's Wage Determination. A.R. R; Drummond Declaration ¶ 17. One week later, Ruzicka met with Computer Department representatives to correlate the labor categories. A.R. S; Drummond Declaration ¶ 17.

NADC issued Amendment 0001 on May 1. A.R. T. That amendment revised the language of Clause H302 to permit an awardee to charge to NADC as direct contract costs any expenses incurred in relocating and recruiting initial staff. The amendment additionally provided a labor comparability chart that set forth the appropriate DoL minimum wages for each CCS and CAEDOS job category.

Then, on May 15, SelectTech sent a letter to NADC stating that, as a result of an inability to find the two analysts necessary to operate the CAEDOS facilities, the company was unable to submit a proposal. A.R. V; Drummond Declaration ¶ 20. NADC thus concluded that an absence of competition would characterize the awarding of a single contract for CCS and CAEDOS support services. Drummond Declaration ¶ 20. Ruzicka therefore asked the Computer Department whether the small CAEDOS portion of the contract could be awarded separately from the CCS portion, as had been done prior to 1983. *Id.* The Computer Department responded affirmatively. A.R. W; Drummond Declaration ¶ 21. Accordingly, Ruzicka prepared Amendment 0002 to the RFP, an amendment which NADC issued on May 17, 1989. A.R. Y; Drummond Declaration ¶ 23. That amendment deleted Clause M17, entitled

"Single Award For All Items," and inserted Clause M16, entitled "Evaluation of Offers for Multiple Awards," which permitted, but did not require, separate CCS and CAE-DOS awards. *Id.* Furthermore, NADC split the procurement into two separate lots: Lot I, covering the CCS portion of the solicitation; and Lot II, covering the CAE-DOS portion. Drummond Declaration ¶ 23.

On June 9, ARC and SelectTech each submitted offers to NADC. ARC proposed a total cost-plus-fixed-fee of $5,502,207.21 for Lot I of the RFP. A.R. BB. SelectTech proposed a total cost-plus-fixed-fee of $4,739,260.03 for that same Lot. A.R. CC. SelectTech represented that it was a small business and a women-owned small business. A.R. CC at 2, 37–38. ARC represented that it was a minority business enterprise and a small disadvantaged business concern. A.R. BB at 2, 35.

For the personnel who would perform Lot I, ARC proposed its incumbent CCS staff, and SelectTech proposed its own Dayton, Ohio employees. SelectTech did nevertheless state in its Technical Proposal that the company:

> [did] not propose to completely replace ... incumbent personnel. Rather, the incumbent personnel that possess the requisite qualifications and experience prescribed in the SOW[] will be offered the first right of refusal for the openings on this program. All positions that are not filled by incumbent personnel will be filled by the proposed personnel or new hires that meet or exceed the contract requirements.

A.R. CC, Technical Proposal at 1–2. SelectTech repeated that staffing plan throughout its proposal. *See, e.g., id.* at 3; *see also* Drummond Declaration at ¶ 27.

Technical proposals for Lot I were forwarded for review to a three-member eval-uation panel. A.R. DD; Drummond Declaration ¶¶ 28–29. On September 12, the panel completed its technical evaluation. A.R. II; Drummond Declaration ¶ 30.[6] The panel rated ARC's technical proposal "excellent," with a score of 94.82 points. Similarly, the panel rated SelectTech's proposal "excellent," with a score of 93.58 points. A.R. II. In the technical category of personnel, for which a total of 40 points were available, the three evaluators individually gave ARC scores of 36, 37, and 38 points—a 37–point average. The scoring was predicated upon ARC's use of its incumbent CCS personnel. In scoring SelectTech, the panel conducted its technical evaluation for the personnel factor based solely on the Ohio staff that that company had proposed. In the personnel category, SelectTech received individual scores of 36, 36, and 38 points—a 36.67–point average that was slightly below ARC's average score. SelectTech's slightly lower technical score resulted primarily from the evaluators' concern that ARC's incumbent employees might "choose not to work for SelectTech" and that SelectTech's phase-in plan might encounter difficulties. A.R. II, Narrative Description (SelectTech).

In September, Cuorato transferred responsibility for the procurement from Ruzicka to another contract negotiator, Loretta Dunn, who was authorized to negotiate with both ARC and SelectTech for Lot I and to negotiate solely with ARC for Lot II. Drummond Declaration ¶¶ 31, 34. On November 3, Dunn prepared requests for Lot I Best and Final Offers (BAFOs) that were sent to ARC and SelectTech. A.R. RR, SS; Drummond Declaration ¶ 36; *see* FAR 15.611, 48 C.F.R. § 15.611 (1989) (request for BAFOs officially closes discussions on a procurement). The following

---

**6.** Technical scoring was done in accordance with the following plan and the corresponding SOW sections set forth in parentheses:
 a. Personnel—Total of 40 points
 (1) Qualifications/Experience of Key Personnel (Sections 2.0–2.13)—40 points
 b. Management Plan—Total of 35 points
 (1) Staffing Plan (Section 10.2) 10 points
 (2) Supervision Plan (Section 10.3) 8 points
 (3) Training Plan (Section 10.4) 5 points
 (4) Phase-in Plan (Section 10.5) 7 points
 (5) Escalation Plan (Section 10.6) 5 points
 c. Corporate Knowledge and Experience—Total of 25 points
 (1) Corporate Background (Section 11.1) 15 points
 (2) List of Contracts (Section 11.1.A) 10 points
 A.R. AA; Drummond Declaration ¶ 25.

were among the statements that were made in the BAFO request: (1) the offers were considered to be technically equal, and award would be made to the offeror proposing the lowest cost; (2) the government reserved the right to make multiple awards; and (3) the number of personnel required remained as stated in the RFP. A.R. RR, SS.

ARC and SelectTech each submitted a BAFO that included a revised cost proposal: ARC, on November 7, and SelectTech, on November 8. The firms' proposed costs for performing Lot I were: SelectTech, $4,621,768.11; ARC, $5,089,975.20. A.R. TT, UU. On November 9, NADC announced that SelectTech was the successful offeror for Lot I. A.R. VV. Dunn and Drummond then prepared a Price Negotiation Memorandum that summarized NADC's price negotiations with ARC and SelectTech. A.R. AAA. Specifically, the memorandum stated that NADC considered SelectTech's offer to be fair and reasonable, found SelectTech to be responsible, and concluded that an award to SelectTech was appropriate under the terms of the RFP. *Id.;* Drummond Declaration ¶ 41.

ARC protested the Lot I proposed award on November 20. A.R. BB; *see* FAR subpart 33.1, 48 C.F.R. § 33.1. In its protest, ARC contended that SelectTech had misrepresented its women-owned and small business status, that SelectTech and ARC's proposals were not technically equal, and that SelectTech was not a responsible offeror whose BAFO could be evaluated as having proposed the offer "most advantageous" to the government in accordance with FAR 15.611(d), 48 C.F.R. § 15.611(d). A.R. BB.

Upon receipt of ARC's protest, Dunn investigated SelectTech's status as a small business. Her investigation, which included Dun and Bradstreet financial reports on SelectTech from NADC's Small Business Office, as well as inquiries made to various federal agencies, verified that SelectTech was a small business under the applicable size standard. A.R. CCC; Drummond Declaration ¶ 43.

On November 27, the deputy head of the Computer Department wrote to Cuorato that any delay in awarding Lot I beyond the November 30 expiration date of ARC's contract would "severely curtail" the CCS operations and would adversely impact upon the projects that the CCS supports. A.R. DDD; Drummond Declaration ¶ 44. After Drummond reviewed ARC's protest, he determined that it was meritless and recommended to his immediate supervisor, Commander Wayne J. Vanderslice, that NADC proceed with the award. On November 27, Commander Vanderslice executed a determination that the award be made to SelectTech. A.R. EEE; Drummond Declaration ¶ 44.

Finally, on November 28, 1989, Contract N62269–90–C–0316 was awarded to SelectTech to perform NADC's CCS services. At approximately the same time, NADC awarded to ARC a contract to perform NADC's CAEDOS services. A.R. III; Drummond Declaration ¶ 46.

In a November 30 letter, Drummond denied ARC's protest. A.R. FFF. A representative of the Small Business Administration later wrote to NADC on January 31, 1990 and stated that the SBA had determined that SelectTech was a small business under the seven-million-dollar size standard applicable to the Lot I procurement. Federal Defendants Motion for Summary Judgment, Exhibit B.

## III. DISCUSSION

ARC advances six arguments why, based upon the facts in the summary judgment record, it is entitled to summary judgment against the Federal Defendants and SelectTech as a matter of law. *A fortiori,* if the court concludes that the Federal Defendants did not abuse their discretion or violate federal procurement law in awarding Lot I to SelectTech, then the court need not reach ARC's arguments for equitable relief against those defendants.

### A. *Key Personnel*

The gravamen of ARC's amended complaint, and the linchpin of the company's summary judgment motion, is the conten-

tion that the Federal Defendants permitted SelectTech to circumvent the requirements of the RFP's key personnel clause. Specifically, ARC alleges that, in response to the requirement in the key personnel clause that the resumes of proposed personnel be submitted to NADC for evaluation, SelectTech did not submit the resumes of the personnel with whom it planned to staff the contract (ARC's incumbent personnel) but, rather, submitted the resumes of SelectTech's own Dayton, Ohio personnel, whom the company never intended to use at NADC and whom the company never contacted. According to ARC, NADC officials were aware of SelectTech's "subterfuge" but "coached" the evaluation panel, nevertheless, to ignore the key personnel clause and to evaluate SelectTech's Technical Proposal based on the "sham" resumes of SelectTech's Dayton personnel. *See* Amended Complaint ¶¶ 19, 22; ARC's Motion for Summary Judgment at 44, 48, 53, 59. SelectTech was thus able to pull off a "bait and switch": SelectTech "baited" the evaluation panel with Dayton resumes in order to receive a high technical score, then "switched" to ARC's incumbent staff once the award was made. Hence, ARC contends, SelectTech's proposal was not responsive to the key personnel clause; the Federal Defendants abused their discretion and violated procurement law by awarding Lot I to SelectTech; and SelectTech materially misrepresented its staffing intentions, which tainted the entire agency evaluation.

### 1.) Federal Defendants

■ The foundation for ARC's allegations against the Federal Defendants, and the source of ARC's legal theories, is a 1989 decision by the Board of Contract Appeals of the General Services Administration (GSBCA or Board), *Electronic Data Systems Federal Corporation,* GSBCA No. 9869–P, 89–2 B.C.A. (CCH) ¶ 21,655, 1989 WL 30420 (March 1, 1989), 1989 GSBCA LEXIS 64 (*EDS*), *reconsideration denied,* GSBCA No. 9869–P–R, 89–2 B.C.A. (CCH), ¶ 21,778 (April 19, 1989).

In *EDS,* the United States Department of Energy's Energy Information Administration (EIA) solicited proposals for a cost-plus-fixed-fee contract that required the staffing of EIA's computer center with management and support personnel. The solicitation further required offerors to submit a resume for each of the 101 persons proposed for the initial contract year. 1989 GSBCA LEXIS 64, 3–4, 1989 WL 30420. Both Electronic Data Systems Federal Corporation (EDS), which was the incumbent contractor, and Planning Research Corporation (PRC) submitted proposals. The solicitation anticipated that, in the course of the contract's administration, there would be personnel changes. Consequently, the solicitation reserved EIA the right (a) to receive thirty-days advance notice of any proposed replacement of key personnel, (b) to obtain replacement personnel, and (c) to approve or disapprove any proposed replacement of key personnel. *Id.* at 6–7, 1989 WL 30420.

In its initial proposal, PRC submitted 101 resumes that were obtained through a search of PRC's own data base. Prior to submitting those resumes, PRC had contacted neither the proposed personnel nor their supervisors to determine whether such personnel would be able to work for EIA. PRC's initial proposal did nevertheless emphasize that PRC intended to rely on incumbent EDS personnel to staff the contract. *Id.* at 7, 1989 WL 30420. Later, EIA informed PRC that EIA would evaluate the corporation's intention to recruit incumbent personnel as a proposal weakness. In reply, *"PRC stated that the [PRC] people named in [its] proposal would be the actual ones who would perform the contract." Id.* at 9, 1989 WL 30420 (emphasis added). Additionally, in its revised proposal and attached cover letter, PRC stated: "PRC will deliver all proposed personnel identified in our amended proposal.... PRC's transition planning does not assume the retention of incumbent personnel." *Id.* at 10–11, 1989 WL 30420. EIA subsequently awarded the contract to PRC. Days later, with EIA's assistance, PRC contacted and successfully recruited many of EDS's incumbent personnel to staff the contract. *Id.* at 14–17, 1989 WL 30420. EDS then filed a protest.

The GSBCA granted the protest and set aside the award to PRC. In concluding that EIA "wore blinders" to a "bait and switch" by PRC, and that EIA's post-award assistance to PRC completed a "circle of uncompetitiveness," the Board stated:

*Notwithstanding its specific statements to the contrary, PRC never intended to provide the services* of the specific 101 people named in its proposal. PRC simply used their resumes ... for purposes of evaluation, intending all along to make massive substitutions prior to beginning performance of the contract.... [PRC's] *material misrepresentation ...* irreparably tainted the award; it effectively prevented the contracting officer from assuring himself that PRC's BAFO was the most advantageous to the Government.... EIA ... ignored evidence that should have put it on notice of PRC's intended "bait and switch." ... The actions of both EIA and PRC cannot be justified by reference to the personnel substitution clause contained in the contract. That clause is intended to permit the natural turnover of personnel that tends to occur during performance of a contract—it is not a license for the contractor to implement *a new proposal* immediately following contract award. By permitting such massive substitutions, EIA in essence *materially modified ...* the contract requirements.... It also invalidated the evaluation process by undermining the assumptions which formed the basis for the evaluations.

*Id.* at 17–21, 1989 WL 30420 (emphasis added) (citations omitted).

Even assuming that this court owes deference to GSBCA decisions, *EDS* is inapposite. *EDS* turned both on an awardee's intentional misrepresentation that it would not hire incumbent employees and on an agency's disregard of evidence showing that there was such a misrepresentation.

As indicated in the summary judgment record, SelectTech, unlike PRC, was completely forthright throughout negotiations about its intention to use available, qualified incumbent employees. In one of many similar passages in its Technical Proposal, SelectTech stated:

[SelectTech does] not propose to completely replace ... incumbent personnel. Rather, the ... incumbent personnel that possess the requisite qualifications and experience prescribed in the SOW[ ] will be offered the first right of refusal for the openings on this program. All positions that are not filled by incumbent personnel will be filled by the proposed personnel or new hires that meet or exceed the contract requirements.

A.R. CC, Technical Proposal at 1–2. Similarly, in response to an NADC question concerning the staffing and relocation plans set forth in that Technical Proposal, "SelectTech reiterated its intention to offer positions to qualified candidates on the incumbent's staff." Drummond Declaration ¶ 29; A.R. GG at 3–4 ("SelectTech is proposing to staff the ensuing effort with qualified personnel, either persons retained from the incumbent staff, the backup staff or new hires from the local area," and "[a]lthough the probability of having to relocate personnel from Dayton ... is very low, it ... is possible."). NADC never took exception to that intention.

ARC is incorrect in contending that SelectTech, by submitting for evaluation the resumes of its Dayton personnel despite an intention to hire qualified ARC personnel, "baited" NADC's evaluators and chicaned them into giving SelectTech inflated technical scores based only upon the Dayton personnel. Rather than being unaware that SelectTech would staff the CCS contract with incumbent personnel, NADC's evaluators specifically took into account SelectTech's intention to hire such personnel and, as a consequence of that intention, gave SelectTech reduced scores under the technical category "Management Plan." The evaluators were concerned that incumbent personnel might choose not to work for SelectTech and that SelectTech's "phase-in" plan might, then, encounter difficulties. *See* A.R. II, Narrative Description of SelectTech Proposal at 1 (SelectTech's phase-in plan "is based primarily on the assumption that a majority of the incumbents will want to stay employed.... [While] this

plan will work[,] ... [it] could be a problem if the incumbents choose not to work for Select Tech."); A.R. II, Greenblatt Evaluation of SelectTech at 5 (phase-in plan "depends too much on most incumbents coming on-board"); A.R. II, Ingram Evaluation of SelectTech at 5 (phase-in plan "depending too much upon incumbent personnel").[7] The evaluators were not concerned, however, that incumbent personnel would not merit the high scores that SelectTech received for the resumes of its Dayton employees under the technical category "Personnel." Given the presence of the substitution provision of the key personnel clause, such a lack of concern was reasonable.

While RFP Clause H53, the key personnel clause, does not require SelectTech to staff the contract with the proposed Dayton personnel, the clause does provide that substitutions of personnel are to be made in accordance with specific procedures and "with personnel of at least substantially equal ability and qualifications" to the personnel initially proposed. A.R. K, Clause H53(b). The only "bait and switch" that the key personnel clause forbids is one in which a contractor proposes highly qualified staff in order to receive a high evaluation score, but then uses *minimally qualified* personnel to staff the contract. As long as SelectTech staffs the NADC contract with personnel "of at least substantially equal ability and qualifications" to the proposed Dayton staff, regardless of whether such personnel are incumbents, the Navy's interest in employing highly qualified personnel is safeguarded.

A line of Comptroller General decisions further emasculates ARC's contentions. In *Applications Research Corporation,* B–230097, May 25, 1988, 88–1 CPD ¶ 499 [available on WESTLAW, CG database], 1988 U.S.Comp.Gen. LEXIS 549, ARC was the incumbent contractor and the protester of an NADC data technician services contract award to Information Network Systems, Inc. (INS). As in the instant action, the solicitation required offerors to submit detailed resumes for all proposed personnel and stated that technical factors would be accorded more weight than cost factors, with cost increasing in importance as proposals approached technical equality. [available on WESTLAW, CG database] 1988 U.S.Comp.Gen. LEXIS 549, 2. The solicitation expressly permitted personnel substitutions. Moreover, one of the solicitation's clauses specifically provided: "Performance shall be accomplished by contractor personnel in each category having qualifications as represented by the contractor in its proposal as finally accepted by the government." *Id.* at 3, 8. In its proposal, INS stated that it would "strive to hire as many of the incumbent's high quality personnel as possible." *Id.* at 3–4. Because INS was the offeror with the lowest-priced, technically acceptable proposal, NADC awarded the contract to INS.

ARC alleged that when INS submitted its proposal, INS fully intended to perform the required services with ARC personnel rather than with personnel identified in that proposal. ARC further alleged that eighteen of the nineteen personnel that INS eventually employed to staff the contract were former ARC employees at

---

7. As evidence of NADC's alleged disregard of the key personnel clause and blindness to SelectTech's submission of the resumes of Ohio employees, ARC directs the court's attention to notes from a telephone conversation between Ruzicka and SelectTech's Vice President of Operations, Dr. Finch, that occurred on the eve of the issuance of Amendment 0002. *See* ARC's Motion for Summary Judgment at 44; ARC's Exhibit A–13. Even if, under Federal Rule of Evidence 801(d)(2)(C) or (D), statements that are ascribed to Ruzicka and noted in Exhibit A–13 are not hearsay, they are ambiguous, outside of the administrative record, and lacking the "significantly probative" evidentiary value

necessary to create a genuine issue. *See generally Lecher Construction Co.,* B–237964.2, January 29, 1990, 90–1 CPD ¶ 127 (GAO will not attribute bad faith or prejudicial motives to contracting agency on basis of protester's inference or supposition); *Diversified Contract Servs., Inc.,* B–237209, January 22, 1990, 90–1 CPD ¶ 84 (government officials are presumed to act in good faith); *Miklin Corp.,* B–236746.2, January 19, 1990, 90–1 CPD ¶ 72 (GAO will not attribute bad faith or fraudulent motives to government official absent irrefutable proof that official had specific and malicious intent to harm the protester).

NADC. *Id.* at 3. Finally, ARC contended that NADC improperly evaluated the INS proposal based on the qualifications and experience not of the personnel that INS proposed but of ARC's incumbent employees. *Id.* at 4.

In denying the protest, the Comptroller General concluded:

> *[I]t is neither unusual nor inherently improper for an awardee to recruit and hire personnel employed by an incumbent contractor....* [T]he solicitation did not impose any limitation on the number of changes in personnel the contractor could make after award. Rather, the solicitation merely required the contractor to obtain the agency's approval for all substitutions. INS complied with this requirement. There also was no requirement that the contractor commence performance with the personnel listed in its proposal. [The solicitation] merely required that the personnel actually used during contract performance be as qualified as the personnel listed in the contractor's proposal.

*Id.* at 11–13; *accord Booz, Allen & Hamilton, Inc.,* B–236476, December 4, 1989, 89–2 CPD ¶ 513 [available on WESTLAW, CG database], 1989 U.S.Comp.Gen. LEXIS 1335, 6; *A.B. Dick Co.,* B–233142, January 31, 1989, 89–1 CPD ¶ 106 at 5 (where RFP required that contractor obtain agency approval for substitutions and that personnel

actually used during contract performance be as qualified as personnel listed in contractor's proposal, it was not improper for awardee to recruit and hire qualified personnel employed by incumbent contractor).

Attempting to distinguish *Applications Research* from the instant action, ARC argues that the services involved in the 1988 GAO bid protest were merely "basic services" for the solicitation of which NADC deemed it unnecessary to use a "key personnel clause." ARC's Motion for Summary Judgment at 53; ARC's Reply Brief at 8. An agency's characterization of a solicitation provision as a "key personnel clause" does not, however, add some talismanic quality to that provision and bind a contractor to employ the individuals listed in its proposal. To the contrary, key personnel clauses are idiosyncratic and vary according to the particular agency and procurement involved. Hence, where an agency provides in its solicitation that proposed personnel will be deemed "key" but also provides that substitutions with personnel "of at least substantially equal ability and qualifications" are permissible, the word *key* refers to a level of personnel qualification rather than to particular persons. *See Laser Power Technologies, Inc.,* B–233369, B–233369.2, March 13, 1989, 89–1 CPD ¶ 267 [available on WESTLAW, CG database], 1989 U.S.Comp.Gen. LEXIS 297.[8] Hence, *Applications Research* is apposite.

---

**8.** *Laser Power,* in which the Comptroller General reached the same result as he did in *Applications Research,* involved a cost-plus-fixed-fee contract for services that were by no means "basic" and a clause that specifically solicited "key personnel." The United States Air Force, the procuring agency, had solicited proposals to staff its Developmental Optics Facility (DOF) with scientists, engineers, and specialized technicians. The DOF supports the Air Force's high-energy laser and advanced beam weapons programs. [available on WESTLAW, CG database] 1989 U.S.Comp.Gen. LEXIS 297, 3. Under the "personnel qualifications" item of the RFP, offerors were required to supply resumes *and "letters of intent to accept employment"* for designated key personnel positions. *Id.* at 4. The "key personnel" clause stated that such personnel "are considered to be essential to the work being performed." Moreover, the clause required that, prior to diverting key personnel to other programs, the contractor "notify the con-

tracting officer reasonably in advance and ... submit justification (including proposed substitutions) in sufficient detail to permit evaluation of the impact on the program." *Id.* at 20. Laser Power Technologies, Inc. proposed the use of, and obtained written commitments from, much of the incumbent staff. S. Systems Corporation proposed personnel not employed at DOF, but nevertheless stated that it would recruit from the incumbent staff if it were selected. *Id.* at 4. After the Air Force awarded the contract to S. Systems, Laser Power filed a protest with the GAO and contended that S. Systems had violated the key personnel clause by staffing the contract with incumbent personnel rather than with proposed personnel. *Id.* at 19.

Denying Laser Power's protest, the Comptroller General reasoned:

> [T]he Air Force's acceptance of [S. Systems'] approach ... was neither unreasonable nor inconsistent with the evaluation criteria....
> [T]he Air Force reasonably found that many

ARC's contention that SelectTech's proposal to hire qualified, incumbent ARC personnel was unresponsive to the key personnel clause also contradicts federal procurement law, which countenances the hiring of incumbent personnel and which was incorporated into the NADC contract with SelectTech. To be sure, RFP Clause L23 incorporated by reference, "with the same force and effect as if [it were] given in full text," the Federal Acquisition Regulation (FAR), 48 C.F.R. chapter 1 (1989). A.R. K at 43; *see also* 48 C.F.R. § 1.101 ("The Federal Acquisition Regulations System is established for the codification and publication of uniform policies and procedures for acquisition by all executive agencies."). Subpart 22.10 of the FAR applies to all government service contracts and implements the provisions of the McNamara–O'Hara Service Contract Act of 1965, as amended, as well as related Secretary of Labor regulations. FAR §§ 22.1000, 22.-1003–1, 22.1006. Under the FAR, "Service contracts over $2,500 shall contain *mandatory [Service Contract Act] provisions* regarding minimum wages and *fringe benefits.*" FAR § 22.1002–1 (emphasis added).

In Part 4 of Title 29 of the Code of Federal Regulations, the Secretary of Labor has provided official rulings and interpretations with respect to the application of the Service Contract Act of 1965 to federal service contracts. 29 C.F.R. Part 4, § 4.101(a) (1990). Section 4.173 of those rulings and interpretations guides services contract bidders in their attempts to meet requirements for employee vacation fringe benefits and states, in part:

(a) ... It has been found that for many types of service contracts performed at Federal facilities a successor contractor will utilize the employees of the previous contractor in the performance of the contract. The employees typically work at the same location providing the same services to the same clientele over a period of years, with periodic, often annual, changes of employer.

29 C.F.R. § 4.173(a) (1990).

With that statement, the Secretary of Labor has done little more than recognize that successor contractors often hire incumbent employees and that such a practice can affect the vacation fringe benefits of those employees. Still, Section 4.173(a) applies by force of law to SelectTech's contract with NADC and dovetails with the RFP's key personnel clause to provide a context and a procedure for the hiring of those incumbent ARC employees who are qualified, available, and approved by NADC. Thus, SelectTech's statement in its Technical Proposal that it intended to hire qualified ARC employees was responsive to the RFP's key personnel clause.

In summary, the RFP, the FAR, and Comptroller General decisions allow the hiring of incumbent personnel, and the evidence shows that SelectTech neither misrepresented its intention to hire such personnel nor deceived NADC's evaluation panel by submitting the resumes of Dayton employees.

Therefore, based on a review of the summary judgment record, viewed in the light most favorable to ARC and giving ARC the benefit of all reasonable inferences capable of being drawn from the record, the court concludes that there is insufficient evidence that the Federal Defendants abused their discretion or violated federal procurement law when they found SelectTech's proposal to be responsive to the RFP's key personnel clause.

2.) SelectTech

 As noted above, the evidence shows that SelectTech did not misrepresent

---

incumbent personnel would accept positions with S. Systems if it received the award and, meanwhile, other fully qualified personnel were committed to perform the RFP work.... [T]he RFP, which contains the "key personnel" clause ... does not require designated key personnel to be permanent, nor even that the contractor commence performance with the personnel listed in its proposal, so long as the contractor provides personnel as qualified as those listed in the proposal and obtains the Air Force's approval for all substituted key personnel.... Indeed, there is nothing unusual or inherently improper for an awardee to recruit and hire personnel employed by the incumbent contractor.... *Applications Research Co.....*

*Id.* at 28–29.

its intention to hire incumbent ARC employees if awarded the NADC contract. Hence, there is an absence of a genuine issue as to the allegations of such misrepresentation in Count III.

## B. *Evaluation of Proposals*

Having addressed ARC's primary contention, the court turns to a related contention. In its bipartite second argument, which the court has pruned of all key personnel issues resolved above, ARC alleges that the Federal Defendants: (a) irrationally concluded that ARC and SelectTech's offers were technically equal; and (b) abused their discretion and acted in bad faith by intending throughout the procurement to disregard Clauses L17(b)(2) and M31 of the RFP and to award the contract solely on the basis of cost. Amended Complaint ¶¶ 20, 25, 27(a) and (b), 33; ARC's Motion for Summary Judgment at 37 n. 22, 66.

In accordance with the strict Third Circuit standard of review of a contracting agency's procurement decisions, this court need find only that the summary judgment record reveals some "rational basis" for NADC's evaluation of ARC and SelectTech's offers as technically equal and for NADC's conclusion that SelectTech's proposal was the most advantageous to the government. If such a "rational basis" exists, the agency action must be upheld. *See, e.g., Sea–Land Serv., Inc.*, 600 F.2d at 430, 432–34; *cf. Kinnett Dairies, Inc. v. Farrow*, 580 F.2d 1260, 1272 (5th Cir.1978) (courts reviewing government procurement decisions should respect wide discretion accorded to contracting officers in their evaluation of bids); *URS Int'l, Inc.*, B–232500, B–232500.2, January 10, 1989, 89–1 CPD ¶ 21 [available on WESTLAW, CG database] (contracting officers enjoy a "reasonable range of discretion in evaluating proposals and in determining which offer is to be accepted for award").

 As indicated in the administrative record, a single three-member evaluation panel evaluated the Lot I technical proposals of both ARC and SelectTech. The panel evaluated each of those proposals in accordance with specific evaluation factors (personnel, management plan, and corporate background) and a detailed technical scoring plan that provided criteria by which each factor was to be reviewed. *See* A.R. AA; Drummond Declaration ¶ 25. That plan further correlated the evaluation criteria with specific requirements in the SOW. Each panel member completed score sheets that rated each offeror on each criterion. Significantly, panel members scored ARC and SelectTech in the same range on all criteria. *See* A.R. II. Moreover, each panel member certified that he had reviewed the proposals and had *"independently and objectively* rated each proposal consistent with the evaluation criteria and relative weights established for and contained in the stated RFP." *Id.* (emphasis added). Panel members also collectively provided NADC with a Narrative Description of each offeror's technical proposal. Both technical proposals were rated "excellent": they differed by only one and one-quarter points on a 100–point scale. *See Encon Management, Inc.*, B–234679, June 23, 1989, 89–1 CPD ¶ 595 [available on WESTLAW, CG database], 1989 U.S.Comp.Gen. LEXIS 713, 8 n. 2 ("point scores are useful only as guides to decision making [sic]"). ARC has failed to point to any evidence in the record sufficient to raise an issue concerning the reasonableness or fairness of the panel's evaluation.[9] *See* ARC's Motion for Summary Judgment at 66 (admitting that, "absent any direct illegality, any challenge to the assignment of points by the evaluators to individual proposals [is] destined to fail").

Thus, the court's review of the administrative record reveals a careful panel evaluation of both technical proposals in accordance with the RFP. NADC's Contract Review Board, after reviewing the panel's evaluation, concurred with the panel that, based upon ARC and SelectTech's compara-

**9.** ARC's contention that its technical proposal was rated the "best" in a 1986 NADC solicitation, Amended Complaint ¶ 20, is irrelevant.

ble scores, the nature of the CCS work, and the capabilities of the two companies, the proposals were technically equal. *See* Drummond Declaration ¶ 34. Hence, the court concludes that the evaluation of ARC and SelectTech's offers as technically equal was reasonable and not an abuse of discretion.

The court further concludes that, by awarding the contract on the basis of cost, the Federal Defendants neither disregarded RFP Clauses L17(b)(2) and M31 nor acted in bad faith. Clause L17 simply provides:

(a) The Government will award a contract ... to the responsible offeror whose offer conforming to the solicitation will be most advantageous to the Government, price and other factors ... considered.

(b) The Government may ... (2) accept other than the lowest offer....

A.R. K at 41. As noted above, Clause M31 states:

The evaluation of the offeror's cost ... proposal shall be of secondary importance to the evaluation of technical proposals in making award under this solicitation. *Although cost is of secondary importance, it is an important factor and should not be ignored. The degree of its importance will increase with the degree of equality of the proposals in relation to the other factor(s) on which selection is to be based.*

A.R. K at 52 (emphasis added). Despite NADC's discretion to award Lot I to an offeror whose cost proposal was not the lowest, the Federal Defendants could have reasonably concluded that, of the technically equal ARC and SelectTech offers, SelectTech's lower-priced offer was the "most advantageous" to the agency. After all, Clause M31 expressly contemplates that, when technical proposals are evaluated to be equal, cost is in the ascendant. Moreover, Comptroller General decisions permit such an exercise of agency discretion. *See, e.g., Bachy/Bauer/Green Joint Venture,* B–235950, September 18, 1989, 89–2 CPD ¶ 240 at 3 [available on WESTLAW, CG database] ("where, as here, the agency de-termines that two proposals are essentially equal technically, the agency may award the contract to the low cost offeror, even where the solicitation assigns cost less importance than technical considerations"); *accord Applications Research Corp.* [available on WESTLAW, CG database], 1988 U.S.Comp.Gen. LEXIS 549, 14–15; *see also National Medical Seminars Tempharmacists,* B–233452, February 22, 1989, 89–1, 1989 U.S.Comp.Gen. LEXIS 231, 4–5 ("Cost/Technical tradeoffs may be made, and the extent to which one may be sacrificed for the other is governed only by the test of rationality and consistency with the ... evaluation factors.").

As evidence that the Federal Defendants intended from the outset of the procurement to ignore Clause M31 and to award Lot I on the basis of cost regardless of technical equivalence, ARC adduces a handwritten note written by Ruzicka and stating that the procurement was a "Best Value Situation." ARC's Exhibit A–18; ARC's Motion for Summary Judgment at 37 n. 22. "Best value" procurements, however, are those in which,

[T]he low cost offer will not necessarily win.... [A]ward will be made to the offer which, viewed on the whole, offers the "best value" to the Government, taking into consideration both price and technical evaluation factors. This is a common evaluation technique throughout the government, and should be contrasted with the situation where the lowest acceptable bidder automatically wins.

Ruzicka Declaration ¶ 10. Consequently, ARC has not produced any evidence sufficient to suggest that NADC officials acted in bad faith and evaluated ARC's proposal in disregard of Clause M31. *See Diversified Contract Servs., Inc.,* B–237209, January 22, 1990, 90–1 CPD ¶ 84 [available on WESTLAW, CG database] (in order to establish bad faith, a protester must present convincing proof that government officials had a specific and malicious intent to injure the protester). Accordingly, the Federal Defendants are entitled to summary judgment on the asserted dispute concerning bad faith.

## C. Women–Owned Small Business Status

ARC next advances the argument that, pursuant to 13 C.F.R. § 124 and the FAR, the RFP required SelectTech to certify whether it was a women-owned small business concern. Amended Complaint ¶ 10. SelectTech's own technical proposal, ARC contends, indicates that SelectTech is largely operated by Dr. Finch and Mr. Riley, who are both men. *See, e.g.,* ARC's Motion for Summary Judgment at 11 n. 4; ARC's Reply Brief at 14 n. 6. According to ARC, SelectTech certified falsely that it was indeed not only a small business but also women-owned, and SelectTech thus misrepresented its status in order to receive an enhanced evaluation score. ARC's Motion for Summary Judgment at 42–43. ARC alleges that the Federal Defendants therefore abused their discretion by finding SelectTech to be a responsible bidder whose proposal was the most advantageous to NADC. Amended Complaint ¶¶ 14, 21, 27(d); ARC's Motion for Summary Judgment at 63.

### 1.) Federal Defendants

■ There is insufficient evidence that the Federal Defendants acted "clearly illegally" and abused their discretion by concluding that SelectTech was a responsible small business concern that was capable of competently performing the CCS contract.

In evaluating competitive proposals, an agency like NADC must perform its evaluation based "solely on the factors specified in the solicitation." 48 C.F.R. § 15.608(a). NADC's RFP for the CCS services was simply a 100% small business set-aside and nowhere established a set-aside for a specifically *women-owned* small business. *Cf. Transtar Aerospace, Inc.,* B–239467, Au-

gust 16, 1990 [available on WESTLAW, CG database], 1990 U.S.Comp.Gen. LEXIS 854, 4–5 ("there is no program in government procurement which establishes a set-aside for women-owned small business"); ARC's Motion for Summary Judgment at 63 (acknowledging that the CCS procurement was not a women-owned business enterprise set-aside).[10] Hence, NADC's evaluation panel and Contract Review Board, in passing on the CCS proposals, were authorized to evaluate only SelectTech's small business status, not its women-owned status.

As previously noted, after NADC received ARC's award protest questioning SelectTech's small business status, Contract Negotiator Dunn investigated SelectTech's status and concluded that the company was a small business under the applicable size standard. Drummond Declaration ¶ 43. In accordance with the FAR, Drummond and Commander Vanderslice then determined that ARC's protest allegations impugning SelectTech's small business status were merit and further determined that immediate award had to be made to SelectTech to prevent a severe curtailment of CCS services. *See* 48 C.F.R. § 19.302(h) (contract officer is permitted to proceed with award necessary to protect public interest notwithstanding usual requirement that such officer await SBA size determination); *see also* 48 C.F.R. §§ 15.-1004, 33.103(a)(1); Drummond Declaration ¶ 44. The award was then made. There is no evidence that NADC officials acted in any manner but rationally and according to procurement law in concluding that SelectTech was a small business. Furthermore, after the award was made, the SBA in a January 1990 size determination confirmed that SelectTech was a small business. *Cf.*

**10.** Contrary to ARC's allegations, 13 C.F.R. § 124 is not material to the CCS services procurement. That provision concerns only awards set aside by the SBA under its 8(a) program and subcontracted to minority small businesses. 13 C.F.R. § 124.1(b)(1) (1990). The CCS competition was for a prime contract and was not conducted under the 8(a) program. Consequently, 13 C.F.R. § 124, and FAR clauses like FAR 52.219–13 that are cited by ARC and that are to be inserted in solicitations for *sub-*

*contracts,* are irrelevant to the CCS competition. Even were such provisions applicable, they state no more than a government policy to aid women-owned small business concerns; they do not mandate that such concerns receive any special treatment in any particular procurement. *See, e.g.,* 48 C.F.R. §§ 19.901, 19.902, 52.219–13; *California Shorthand Reporting,* B–236680, Dec. 22, 1989, 89–2 CPD ¶ 584 [available on WESTLAW, CG database], 1989 U.S.Comp.Gen. LEXIS 1362, 4.

SelectTech's Motion for Summary Judgment, Exhibit D, Answer to ¶ 25 (ARC admitting in answers to SelectTech's interrogatories that SelectTech was a small business).

■ There is, therefore, no genuine evidentiary basis for ARC's contention that the Federal Defendants abused their discretion in finding SelectTech to be a responsible bidder. Responsibility refers to a bidder's apparent ability and capacity to perform a contract's requirements. *See, e.g., Adrian Supply Co.*, B–239681, August 28, 1990 [available on WESTLAW, CG database], 1990 U.S.Comp.Gen. LEXIS 899, 3–4. To be responsible, a prospective contractor must meet the seven standards set forth in FAR 9.104–1, among which are the requirements that a bidder "have a satisfactory record of integrity" and "be ... qualified and eligible to receive an award under applicable laws and regulations." 48 C.F.R. §§ 9.104–1(d), (g), 9.101. Contracting officers are allowed great discretion in making an initial responsibility determination. In fact, the GAO "will not take exception to an affirmative determination of contractor responsibility unless ... the protester makes a showing of possible fraud or bad faith on the part of the procuring officials." *Colt Indus., Inc.*, B–231213.2, January 23, 1989, 89–1 CPD ¶ 49 at 3 [available on WESTLAW, CG database] (quoting 4 C.F.R. § 21.3(m)(5) (1990)); *accord National Council of Fishing Vessel Safety and Ins.*, B–239303, August 15, 1990 [available on WESTLAW, CG database], 1990 U.S.Comp.Gen. LEXIS 853, 7. Where, as here, there is a dearth of evidence of fraud or bad faith, and where the Contracting Officers not only determined that SelectTech was a "technically competent and financially sound" small business but also

learned from various agencies that the company's reputation for quality work and responsiveness was good, no abuse of discretion exists and the affirmative determination of contractor responsibility must be upheld. *See* A.R. AAA, Summary.

The "certification" in SelectTech's proposal that ARC refers to is merely a "representation" that the government requires all bidders for government contracts to make concerning their women-owned small business status. That representation is routinely sought in such contracts where performance is to take place within the United States and where the contract cost exceeds $25,000. *See* 48 C.F.R. §§ 19.-304(c), 52.219–3. Rather than having anything to do with the contractor's ability to perform a contract responsibly, the purpose of the women-owned representation is administrative: it facilitates the government's compilation of statistics on federal awards to women-owned businesses. *See* Exec.Order No. 12138, 3 C.F.R. 393, 396–97 (1980).

2.) SelectTech

Turning to ARC's allegations in Count III that SelectTech misrepresented its women-owned status, the court need not reach SelectTech's arguments that such misrepresentation claims are preempted by federal law or that ARC has failed to demonstrate sufficient reliance on such alleged misrepresentations. As noted above, ARC's asserted dispute of fact as to SelectTech's misrepresentations depends upon a women-owned small business representation that was not material to the procurement process for the CCS services. Resolution of that asserted factual dispute could not affect the outcome of this case under the applicable substantive law.[11] Given the

---

11. The evidence suggests that ARC's allegations of misrepresentation also fail on the merits. SelectTech's women-owned representation incorporated FAR 52.219–3(b), which defines "women-owned" as "a small business that is at least 51 percent owned by a woman or women who are U.S. citizens *and who also control and operate* the business." 48 C.F.R. § 52.219–3(b). Although FAR 52.219–3(b) does not define the words *control* and *operate*, the Executive Order upon which that provision is based defines *con-*

*trol* as "exercising the power to make policy decisions" and *operate* as "being actively involved in the day-to-day management." *Exec. Order* 12138, 3 C.F.R. at 397.

Three women—Horn, Orum, and Vikmanis—own over sixty percent of SelectTech's stock. Those same three women are each on SelectTech's four-member Board of Directors. As Board members, each woman exercises the power to hire officers, establish employee compensation, and oversee SelectTech's operations.

absence of an asserted dispute of material fact as to SelectTech's alleged misrepresentations of its women-owned status, SelectTech is entitled to summary judgment on Count III.

## D. *Amendments to the Solicitation*

ARC's fourth argument is that the Federal Defendants issued Amendments 0001 and 0002 to the RFP solely at SelectTech's request, without any rational basis, and simply to encourage SelectTech to bid against ARC. As a consequence, ARC contends, the Federal Defendants abused their discretion by issuing the amendments. Amended Complaint ¶¶ 8, 26; ARC's Motion for Summary Judgment at 17, 29, 62–63. The record contains no support for this contention.

### 1.) Amendment 0001

██ As indicated above, Amendment 0001 both revised RFP Clause H302, which concerned the costs for relocating and recruiting a contractor's personnel, and established a comparability table for DoL wage determinations. Such changes to the RFP, although made in response to questions raised by SelectTech, clarified real ambiguities and defects in the RFP.

The original Clause H302 was unclear. Although it prohibited charging directly to the contract the costs for relocating and recruiting replacement personnel, the clause did not state whether that prohibition also applied to the costs for relocating and recruiting initial staff. In response to SelectTech's request for a clarification of Clause H302, and after consulting with NADC's Office of Counsel, Ruzicka determined that the clause did not say what it was intended to say. A.R. M, N; Drummond Declaration ¶ 14. The clause, as re-drafted and eventually as part of Amendment 0001, therefore stated clearly that it permitted an awardee to charge to NADC as direct contract costs the expenses incurred in relocating and recruiting initial staff.

A further cause of procurement confusion was the lack of correspondence between the minimum wage labor categories cited in the unamended RFP and the labor categories set forth in the DoL's Wage Determination. During a site visit, SelectTech alerted NADC officials to that discrepancy. In order to comply with the Service Contract Act of 1965 and to clarify the RFP, Ruzicka met with other NADC officials to match each category of personnel under the RFP with the appropriate DoL category. A.R. S; Drummond Declaration ¶ 17. As a result, Amendment 0001 provided a corrected labor comparability chart that listed the appropriate DoL minimum wages for each CCS and CAEDOS job category.

Hence, the changes that Amendment 0001 made to the RFP were made in response to legitimate questions that required clarification. NADC officials recognized the need to amend the RFP and acted consistently with federal procurement law. As FAR 15.410(a) recognizes, "After issuance of a solicitation, but before the date set for receipt of proposals, it may be necessary to [amend the solicitation] ... (2) [to] correct defects or ambiguities...." 48 C.F.R. § 15.410(a). Amendment 0001 was just such a correction and applied to ARC as well as to SelectTech. ARC has pointed to no evidence showing that it was prejudiced by that amendment. The court therefore concludes that there is no genuine dispute that the Federal Defendants abused their discretion by issuing Amendment 0001.

---

See Ohio Rev.Code Ann. § 1701.59 (Baldwin 1990) ("all of the authority of a corporation shall be exercised by or under the direction of its directors"). Therefore, the only possible stumbling block to a conclusion that SelectTech accurately represented itself as a women-owned business is the fact that Horn, who owns approximately twenty-five percent of SelectTech's stock, is no longer actively involved in Select-

Tech's daily operations. The court nevertheless is satisfied that the fact that the two women who are active in SelectTech's daily management own fifty percent of the total shares of all persons involved in the company's daily management is sufficient to show that the women who own and control SelectTech also "operate" the company.

**2.) Amendment 0002**

■ Amendment 0002 to the RFP allowed for separate contract awards for CCS and CAEDOS services. To reflect the determination that NADC could make such separate awards, the amendment further split the procurement into Lots I and II. Such changes to the RFP were rational and in accordance with law.

When SelectTech wrote to NADC and stated that the company could not find the analysts necessary to operate the CAEDOS facilities and was therefore withdrawing from the Center's competition, NADC officials reasonably concluded that Select-Tech's withdrawal would result in an absence of competition for the single CCS/CAEDOS contract. After all, ARC appeared to be the only bidder able to provide resumes for the CAEDOS services. Aware that separate awards for CCS and CAEDOS services had been made prior to 1983, and reassured by NADC's Computer Department that separate awards would be technically workable, Ruzicka determined that separate awards would increase competition, and he prepared Amendment 0002. *See* A.R. V; Drummond Declaration ¶¶ 20, 21, 23.

The Competition in Contracting Act mandates that federal agencies must maximize competition when conducting a procurement for government services. 41 U.S.C. § 253(a)(1)(A) (1987); *accord* 10 U.S.C. § 2304(a)(1)(A) (West Supp.1990). That statutory mandate is reflected in FAR 6.101, which provides:

> (b) Contracting officers shall provide for full and open competition through use of the competitive procedure or combination of competitive procedures ... that is best suited to the circumstances of the contract action. Contracting officers must use good judgment in selecting the procedure that best meets the needs of the Government.

48 C.F.R. § 6.101(b). Contracting officers thus have the discretion to make multiple awards when the solicitation, as of the award date, does not prohibit such awards. *See, e.g., Steel Circle Bldg. Co.,* B–233055, B–233056, February 10, 1989, 89–1 CPD ¶ 139 at 3 [available on WESTLAW, CG database]. Moreover, such officers should make multiple awards when to do so enhances competition. *See, e.g., id.* (not an abuse of discretion to make multiple awards, "particularly since the consolidating of requirements ... tends to restrict ... competition ..."); *Barnes Elec. Co.,* B–234935, July 19, 1989, 89–2 CPD ¶ 61 [available on WESTLAW, CG database], 1989 U.S.Comp.Gen. LEXIS 789, 4 ("sealed-bid contracts must be awarded to the government's best price advantage, whether that advantage arises from awarding a single contract or multiple contracts").

As noted above, Amendment 0002 simply altered the RFP to permit, but not to require, multiple awards. Clause M16, which that amendment inserted in the RFP, mirrors a clause that FAR 15.407(h) requires contracting officers to insert in solicitations "if the contracting officer determines that multiple awards might [be economically advantageous to the Government and might, therefore,] be made...." 48 C.F.R. §§ 15.-407(h); 52.215–34.

Because ARC has not produced evidence sufficient to support a finding that the Federal Defendants acted without a rational basis or contrary to law by issuing Amendment 0002, ARC is not entitled to summary judgment on this ground. The evidence shows that, rather than evincing bias in favor of SelectTech, Amendment 0002 was in accordance with the applicable law and regulations and promoted the government's interest in obtaining competitive bids.

**E. *Opportunity to Inspect Files and Supplement Protest***

■ Similarly unsupported is ARC's penultimate argument that the Federal Defendants abused their discretion prior to award by denying ARC the opportunity to inspect NADC's files and to supplement ARC's protest. Amended Complaint ¶¶ 14, 16, 27(c).

In its award protest, ARC specifically requested permission to review SelectTech's proposal for Lot I. A.R. BBB at 6. Review of a competitor's proposal in nego-

tiated procurements is, however, not permitted. At most, an unsuccessful offeror may request in writing that the procuring agency debrief the offeror after award and "furnish[ ] the basis for the selection decision and contract award." 48 C.F.R. § 15.1003(a). But even such debriefing must not make "point-by-point comparisons with other offerors' proposals" and must not reveal trade secrets or privileged or confidential commercial and financial information. 48 C.F.R. § 15.1003(b). Hence, even had ARC requested a debriefing, resolution of the company's allegation that it was arbitrarily denied the opportunity to inspect NADC's files could not affect the outcome of this case under the applicable substantive law. That allegation is, therefore, immaterial.

■ Additionally, NADC's contracting officers did not abuse their discretion by proceeding with award without giving ARC an opportunity to supplement its protest prior to award. *See* A.R. BBB at 6. As the court has already noted, NADC officials determined that ARC's protest was merit and that NADC urgently needed the CCS and CAEDOS services. *See* Drummond Declaration ¶ 44. A contracting officer need not withhold an award of a services contract until a protest is resolved if the services are urgently required. *See* 48 C.F.R. § 33.103(a)(1) (dealing with protests against award in sealed bidding); 48 C.F.R. § 15.1004 ("[p]rotests against award in negotiated acquisitions shall be treated substantially the same as in sealed bidding"). ARC has failed to designate specific facts sufficient even to raise an inference that NADC was not in urgent need of the CCS and CAEDOS services. There is, therefore, insufficient evidence that the Federal Defendants abused their discretion by denying ARC an opportunity to supplement its protest.

Thus, ARC's fifth argument has failed to demonstrate a genuine issue for trial.

### F. *Performance Issues*

■ Finally, ARC contends that, since NADC's award to SelectTech, SelectTech has circumvented the RFP by advertising for personnel in Pennsylvania newspapers, has failed to comply with a requirement in the SOW that all contractor personnel have secret security clearances, and has failed to staff the contract at the level and with the personnel that the RFP and the SOW require. ARC asserts that NADC has condoned those actions and omissions. As a consequence, ARC argues, the Federal Defendants have materially modified the contract to SelectTech and have abused their discretion. Amended Complaint ¶¶ 17, 19(a) and (b), 23, 24, 27(f) and (g), 28; ARC's Motion for Summary Judgment at 60–61; ARC's Reply Brief at 4–7.

This court's review of NADC's action is limited under the APA to the Center's award decision and to the administrative record before NADC's contracting officers when they made that decision. Thus, while ARC may challenge the award process, the company may not seek review of Select-Tech's performance of its NADC contract.

More fundamentally, as the Court of Appeals for the District of Columbia has held, the constitutional and prudential standing that disappointed bidders have to challenge the failure of an administrative agency to follow procurement law regarding contract awards does not provide such bidders the right to challenge the administration of government contracts. In *Gull Airborne Instruments, Inc. v. Weinberger*, the disappointed bidder, Gull, contended that it had standing under Section 702 to protest not only an award to another bidder but also the Navy's maladministration of the contract. *Gull Airborne Instruments, Inc. v. Weinberger*, 694 F.2d 838, 841 (D.C. Cir.1982). Although the court of appeals assumed that the Navy's award conferred constitutional standing on Gull, the court reasoned that the cognizable injury that Gull had sustained was insufficient to confer upon that bidder the prudential standing necessary to contest the administration of the contract:

> [To have prudential standing,] Gull must also demonstrate that the regulatory or statutory requirements it seeks to enforce were intended to protect it against such competitive injury. Unlike the reg-

**686**

ulations concerning the award of contracts, the regulations governing termination of contracts for default are not designed to foster competition or to protect unsuccessful bidders from illegal injury to their economic interests. The default regulations are intended to protect the government against injury from the contractor's inability to perform the contract and the contracting party from the government's premature or unjustified cancellation.

*Gull Airborne,* 694 F.2d at 842 (citations omitted); *see also National Fed'n of Federal Employees v. Cheney,* 883 F.2d 1038, 1053 (D.C.Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 3214, 110 L.Ed.2d 662 (1990) (the special relationship between the government and bidders that gives rise to disappointed bidder standing ends once the solicitation and award process is complete); *CC Distribs., Inc. v. United States,* 883 F.2d 146, 151 (D.C.Cir.1989) (court in *Gull Airborne* concluded that disappointed bidder lacked prudential standing); *cf.* 4 C.F.R. § 21.3(m)(1) (1990) (GAO will not consider matters of contract administration under its bid protest function); *Applications Research Corp.* [available on WEST-LAW, CG database], 1988 U.S.Comp.Gen. LEXIS 549, 14 ("the fact that the agency may have relaxed some security requirements ... seems to us ... in the nature of routine contract administration").

ARC has failed to point to evidence that demonstrates that either the Contract Disputes Act of 1978, 41 U.S.C. § 601 *et seq.,* or dispute clauses in SelectTech's contract with NADC were intended to protect ARC against competitive injury. Hence, the court concludes that ARC lacks the prudential standing necessary for it to challenge the Federal Defendants' administration of the contract. Any deficiencies in SelectTech's performance of the contract for CCS services must be handled in accordance

with the rights and remedies that NADC and SelectTech have under the contract.[12]

## IV. CONCLUSION

Therefore, having made a searching inquiry into the summary judgment record, drawing all reasonable inferences favorably to ARC, and without weighing the evidence or substituting its judgment for the judgment of the Federal Defendants, the court concludes that the Federal Defendants' decision to award Contract 0316 to SelectTech was rational, factually supported, not an abuse of discretion, and consistent with procurement law and well-reasoned Comptroller General decisions. Under the narrow standard of review set forth in Section 706 and the precedent of the Court of Appeals for the Third Circuit, this court's inquiry is at an end. ARC has not carried its burden of designating specific facts showing that there is a genuine issue of material fact for trial on Counts I and II.

The court further concludes that ARC has failed to carry its burden of showing that there is a material factual dispute for trial on Count III.

Accordingly, ARC's motion for summary judgment will be denied, the Federal Defendants' motion for summary judgment will be granted, and SelectTech's motion for summary judgment will be granted.

12. The evidence suggests, nevertheless, that SelectTech has staffed the CCS services contract above the minimum level of twenty-one personnel set forth in the contract requirements of the SOW. *See* A.R. K, Section C (SOW) §§ 1.2.3.1 (minimum number of twenty-one CCS personnel required for each shift); 1.2.2.1 ("The government reserves the right to decrease the manpower limits when necessary"); 1.2.1 ("The contractor is granted flexibility as to how the contract is staffed"). Given the cost reimbursement nature of the contract, NADC benefits from any savings that SelectTech can make by reducing the number of CCS personnel without sacrificing efficient operation of the CCS facilities.